<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BLANCHE L. KOBESKY,<br><br>                          Plaintiff,<br><br>v.<br><br>STILLWATER TOWNSHIP, ET AL.,<br><br>                          Defendants. | Civ. No. 09-3702 (DRD)<br><br>**O P I N I O N** |

*Appearances by:*

NUSBAUM, STEIN, GOLDSTEIN, BRONSTEIN & KRON
by: Robert D. Kobin, Esq.
20 Commerce Boulevard, Suite E
Succasunna, NJ 07876

    *Attorneys for Plaintiffs*

GEBHARDT & KIEFER, P.C.
by: Tracy B. Bussel, Esq. and Deborah B. Rosenthal, Esq.
1318 Route 31, P.O. Box 4001
Clinton, NJ 08809

    *Attorneys for Defendants*

**<u>DEBEVOISE, Senior District Judge</u>**

      This matter arises out of the May 14, 2008 arrest of Plaintiff, Blanche L. Kobesky, by Officers George M. Laoudis and Arlene D. Lippencott (collectively "the arresting officers") of the Stillwater Township Police Department ("STPD") shortly after a domestic dispute in which she assaulted her husband. After being arrested, Plaintiff was transported to a local hospital,

where she was held for one night while doctors completed various mental health tests and an alcohol screening.  In a Complaint filed on July 24, 2009, Plaintiff alleged that her arrest and subsequent detention was unlawful and included excessive force that caused her severe physical injuries and emotional distress.  On the basis of those allegations, she argues that the arresting officers violated her rights under the United States Constitution and asserts claims against them, the STPD, and Stillwater Township (collectively "Defendants") under 42 U.S.C. § 1983 for unlawful arrest, excessive use of force, and unlawful imprisonment.  In addition to her federal claims, Plaintiff also asserts causes of action for false arrest, excessive use of force, and unlawful imprisonment under New Jersey state law.

Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56.  In doing so, they contend that Plaintiff's arrest and subsequent detention did not violate her civil rights because the arresting officers had probable cause to believe that she was engaged in illegal activity and the duration of her confinement was reasonable.  In the alternative, Defendants argue that the arresting officers are entitled to qualified immunity and that Plaintiff's claims against the Township and the STPD must be dismissed for failure to demonstrate that any violations of her rights were committed pursuant to a policy or practice promulgated by those entities.  Moreover, Defendants contend that Plaintiff's agreement to participate in a Pre-Trial Intervention program ("PTI") in connection with a criminal case arising out of the same incident as this litigation bars her claims in this suit.

For the reasons set forth below, Defendants' Motion for Summary Judgment will be granted and Plaintiff's claims will be dismissed.  Plaintiff's claims are utterly without merit.  Documentary evidence in the record – including audio recordings of her arrest and records from the hospital in which she was held – demonstrate conclusively that Plaintiff (1) admitted that she

had assaulted her husband, (2) resisted the Defendant police officers' attempts to place her in custody, (3) assaulted officer Lippencott in the course of her arrest, and (4) was detained just long enough for medical personnel to determine that she was not in danger of physical harm from the combination of alcohol and prescription drugs she consumed on the night of her arrest. Far from violating her constitutional rights, the facts show that Plaintiff's arrest and subsequent detention were legally justified and carried out in a reasonable manner. Therefore, her claims against the Defendants will be dismissed in their entirety with prejudice.

## I.  BACKGROUND

As is common in disputes such as this one, the parties advance very different versions of the events that transpired on the night of Plaintiff's arrest and detention. The allegations contained in Plaintiff's Complaint are sparse, and leave out relevant details. With regard to her arrest, Plaintiff simply states that the arresting officers arrived at her house "in response to a report of a domestic dispute that occurred between [her] and her husband." (Compl. ¶ 6.) She alleges that, "after conversing only with [her] husband," they "forcibly entered [her] residence in order to effect a warrantless arrest." (Id. ¶ 7.) Despite acknowledging that the arresting officers received reports that she had assaulted her husband, Plaintiff claims that her arrest was undertaken without probable cause because that assault was "not observed by any police officer" and was "a disorderly person's offense" rather than a severe crime. (Id.)

Plaintiff's allegations relating to her excessive force claim are similarly thin on details. She claims only that the arresting officers "recklessly and unreasonably applied … excessive force against the person of the Plaintiff, which consisted of forcing the elderly Plaintiff to the floor of her residence for the unnecessary application of handcuff restraints." (Id. ¶ 8.) Plaintiff

3

claims that she suffered severe injuries to her shoulder as a result of the arresting officers' actions. (Id.)

After taking Plaintiff into custody, the arresting officers transported her to a local hospital, where she alleges that she was forced to undergo an "involuntary mental health examination and alcohol testing." (Id. ¶ 12.) Plaintiff claims that she objected to being taken to the hospital, asking instead that she be allowed to appear before a judicial officer. (Id. ¶ 11.) Plaintiff asserts that she was improperly detained at the hospital throughout the night and was not released until the day following her arrest. (Id. ¶ 13.)

The documentary evidence submitted by Defendants along with their Motion for Summary Judgment paints a much more detailed picture of the circumstances surrounding Plaintiff's arrest and detention – one that is fundamentally at odds with Plaintiff's assertion that the arresting officers violated her civil rights. The arresting officers were equipped with an audio recording device that captured the entire incident up to the point at which Plaintiff was taken to the hospital. See (Def.'s Br. Supp. Mot. Summ. J., Decl. of Deborah B. Rosenthal ("Rosenthal Decl."), Ex. D.) The transcript of that recording reveals Plaintiff's arrest and subsequent detention were precipitated due to reasonable concerns for her own safety and were carried out in a lawful manner.

The arresting officers arrived at Plaintiff's house on the night of May 14, 2008 to find her husband standing outside. He informed them that he and Plaintiff had engaged in a dispute over one of his prescription medications. (Id. at 3:20-4:6, 7:17-21.) When that dispute escalated, Plaintiff attempted to choke him. (Id. at 6:14-17.) Mr. Kobesky stated that Plaintiff had previously been in a mental hospital, (Id. at 6:11-13), and that he was "afraid of her." (Id. at 9:13.) Mr. Kobesky told the arresting officers that Plaintiff had been drinking and expressed a

4

concern for her physical safety because "she falls down and hurts herself." (Id. at 16:5-11, 25:1-4.) He asked that they help him obtain a restraining order so that she would not be able to assault him again. (Id. at 15:8-10.) When asked whether Plaintiff was aware that he had called the police, Mr. Kobesky answered in the affirmative and stated that Plaintiff was angry because he had done so. (Id. at 13:8-13.) He told the arresting officers that Plaintiff had entrenched herself inside the house and locked the entrances, but that they could enter through the garage. (Id. at 17:5-16.)

Rather than forcibly entering Plaintiff's home, the arresting officers and an emergency medical technician ("EMT") approached the house and knocked on its front door. (Id. at 25:22-26:11.) Plaintiff conversed with them from behind the locked door. (Id. at 27:6-20.) When the EMT inquired as to her condition, she admitted to drinking wine and taking medication earlier that night, but became angry when the EMT noted that she was slurring her speech. (Id. at 26:21-24, 28:5-29:19.) After the EMT stated that he was concerned for Plaintiff's safety and noted that she was having difficulty maintaining her balance, she informed him that she was on medication, but refused to disclose the specific drugs she had consumed. (Id. at 30:2-19.) When the EMT inquired as to why she had attempted to choke her husband, Plaintiff admitted to the assault, stating "[b]ecause he's a pain in the ass." (Id. at 35:10-14.) see also (Id. at 41:6-22.) In fact, Plaintiff informed the EMT that she had previously been detained at a mental health institution because she had "an anger problem" and had punched both her husband and son in their faces on at least one occasion. (Id. at 36:14-37:25.)

Following a short conversation with Plaintiff in which he observed that she appeared inebriated, was slurring her speech, and had admitted to consuming alcohol and prescription medications, the EMT told Plaintiff that she would be taken to the local hospital for medical tests

5

to ensure her safety.  (Id. at 42:2-8.)  At that point, Plaintiff became obstreperous and verbally abusive.  See generally (Id. at 42:9-49:6.)  The EMT and arresting officers responded by repeatedly informing her that she could voluntarily accompany them to the hospital, but would be arrested and taken involuntarily if she refused.  (Id. at 42:13-16, 45:23-46:6, 46:17-25, 47:22-48:1.)  In fact, Officer Lippencott specifically told Plaintiff that she would be handcuffed if she refused to go voluntarily.  (Id. at 46:1-2.)

After Plaintiff refused to go voluntarily, the arresting officers attempted to detain her.[1]  When they did, Plaintiff flew into a fit of rage.  (Id. at 49:2-21.)  The arresting officers tried to handcuff her by pinning her face down on the floor.  (Id. at 49:22-50:2.)  When they did, they apparently injured her shoulder, as Plaintiff began screaming that she was in pain and threatening to sue them.  (Id. at 50:3-9.)  Despite her protestations of pain, however, Plaintiff did not stop physically resisting the officers' efforts to place her under arrest.  Rather, she latched onto Officer Lippencott's arm, scratching her and causing wounds.  See (Id. at 51:9-53:9) see also (Id. at 71:5-7) (Officer Laoudis informed Plaintiff that "you're in handcuffs, but that's because you scratched [Officer Lippencott.]  The officer's got big scratches all over her arm."); (Id. at 102:24-103:3) (in which an emergency medical responder advised Officer Lippencott to clean "that wound.")  Officer Lippencott repeatedly instructed Plaintiff to release her grip, informing her that she could be charged with resisting arrest if she did not comply, but to no avail.  (Id. at 51:19, 51:22-23, 51:25-52:1, 52:14, 52:16-17, 53:3-9, 52:21.)  As Officer Laoudis secured the handcuffs, Plaintiff – who at this point was completely apoplectic – shouted, "I will kill you

---

[1] It is unclear when the arresting officers and the EMT entered Plaintiff's residence, but the audio recording of the incident contains no evidence that they forced their way in.  To the contrary, Plaintiff was engaged in conversation with the officers during the entire period prior to her arrest, and at no point did she ever object to their presence in her home or indicate that they had forcibly entered.

people[!]  I'll kill you[!]  I'm going to sue you[!]" (54:8-10.)  Shortly thereafter, Plaintiff elaborated on her threat, screaming:

> You bastards, that's what you are[!]  Come into somebody's home and take them like this.  I'll sue you[!]  I'll sue yous[!]  I'm going to sue yous for every damned nickel you have[!]  I'll take your homes and everything[!]  I'm going to sue yous[!]  You wait and see what I do to you[!]

(Id. at 56:3-10.)

Immediately after securing Plaintiff's handcuffs, Officer Laoudis recited her rights are required by Miranda v. Arizona, 384 U.S. 436 (1996).  (Id. at 56:19-57:4.)  The arresting officers informed Plaintiff that she would be placed in an ambulance and taken to the hospital.  (Id. at 59:3-5.)  Plaintiff objected, stating, "I don't go to the hospital.  You take me to jail.  I want to go to jail, now.  Put me in jail.  I ain't going to the hospital."  (Id. at 59:8-11.)

For the next several minutes the arresting officers and EMT negotiated with Plaintiff in an attempt to convince her to leave her house under her own power rather than being carried out forcibly.  See, e.g., (Id. at 62:21-63:3, 86:13-87:5.)  During that time, the arresting officers repeatedly offered to move Plaintiff's hands from behind her back to the front side of her body in order to alleviate the pain in her shoulder.  (Id. 65:19-21, 66:9-12, 67:23-25, 68:15-17, 69:8-13.) They were unable to do so because Plaintiff continued to physically resist, rolling on the floor while kicking and screaming at the arresting officers.  See generally (Id. at 62:21-87:5.)  With the help of the EMT, the arresting officers eventually convinced Plaintiff to leave the house by deceiving her into thinking they would take her to jail instead of the hospital.  (Id. at 87:21-88:4, 92:1-5, 94:9-16.)  The arresting officers attempted to place Plaintiff in an ambulance, but when she objected they placed her in their patrol car and transported her to the hospital.  (Id. at 100:10-101:4.)

According to Plaintiff's medical records, which Defendants submitted as an exhibit to their Motion for Summary Judgment, she arrived at the hospital at 10:42 p.m. on May 14, 2008. (Rosenthal Decl., Ex. F at 2.) When she was admitted, medical personnel observed that she "appeared to have been drinking. (Id. at 3.) The medical clinician who examined Plaintiff reported that she suffered from "severe depression" and recommended that she be placed on a "psychiatric hold" for "observation overnight." (Id. at 11.) The clinician noted that Plaintiff had "refused voluntary admission," but had subsequently "agreed to stay [at the hospital] until a.m." (Id.) After being observed by hospital staff throughout the night, Plaintiff was discharged the following morning at 10:05 a.m. (Id. at 29.) The total duration of her confinement at the hospital was roughly 12.5 hours.

After being released from the hospital, Plaintiff was charged with aggravated assault on a police officer in violation of N.J. Stat. Ann. § 2C:12-1(b)(5)(a) for attacking Officer Lippencott during the course of her arrest. On August 11, 2008, Plaintiff appeared in front of a New Jersey state court judge, waived indictment, and agreed to enter a PTI program. Under the terms of that program, Plaintiff was required to pay certain fines and continue mental health treatment, and submit to substance abuse testing for a period of roughly one year. In exchange, the prosecuting authorities agreed to dismiss the charges against her on completion of the program. Plaintiff performed her obligations under the PTI program, and on July 16, 2009 the state court entered an order dismissing the charges against her. See (Rosenthal Decl., Ex. U.)

## II.  DISCUSSION

Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56. In doing so, they assert four main arguments. First, Defendants contend as a factual matter that the arresting officers acted lawfully by taking Plaintiff into custody and

transporting her to the hospital.  Even if their actions were not justified, Defendants assert that the arresting officers are entitled to qualified immunity.  Furthermore, Defendants argue that Plaintiff's claims are barred by her decision to enter the PTI program.  Finally, they argue that the vicarious liability claims against the Township and STPD should be dismissed because Plaintiff has not demonstrated that the arresting officers acted pursuant to a policy or practice promulgated by either of those entities.

Plaintiff did not submit opposition to the pending Motion for Summary Judgment.[2] Therefore, the Court must accept Defendants' factual assertions, L. Civ. R. 56.1(a), and

---

[2] Plaintiff's original counsel moved to withdraw from this litigation on May 12, 2010.  On July 15, 2010, Plaintiff served notice of her consent to the substitution of Robert D. Kobin, Esq. as her counsel of record.  The Court granted her request, and adjourned the pending Motion for Summary Judgment – which had been filed roughly one month earlier – until August 16, 2010 so that Mr. Kobin would have adequate time to prepare opposition.  Pursuant to that adjournment, Plaintiff's opposition was due on August 2, 2010.  See L. Civ. R. 78.1(a).  Rather than filing opposition, however, Mr. Kobin submitted a letter on August 9, 2010 requesting an additional adjournment until September 20, 2010.  The Court granted that request, thereby moving the date on which Plaintiff's opposition was due to September 7, 2010.  Id.  Again, Mr. Kobin failed to submit opposition on behalf of Plaintiff by that deadline.  In fact, he failed to submit any correspondence whatsoever until after September 14, 2010, when the Court contacted his office by telephone to inquire as to whether he intended to oppose the pending Motion.  The following day, Mr. Kobin submitted a second letter seeking yet another adjournment.  Again, the Court granted his request, and adjourned the Motion to September 16, 2010.  In doing so, the Court explicitly noted on its electronic docket that Plaintiff's opposition brief would be due on October 4, 2010.  Yet once again, Mr. Kobin failed to file opposition or communicate with the Court.  On October 7, 2010, the Court – now suffering from a sense of déjà vu – contacted Mr. Kobin by telephone to inquire as to the status of Plaintiff's opposition papers.  During that call, Mr. Kobin informed the Court's staff that his brief "was being typed up" and promised it would be filed by the end of the day.  Additionally, he stated that he would seek the consent of his adversary for yet another adjournment.  It now appears that Mr. Kobin failed to carry out both those promises.  Rather than opposition to the pending Motion, his office submitted two letters on October 14 and 15, 2010 – a full week after the October 7th telephone conversation in which he promised to file his brief by the end of that day – stating that Mr. Kobin was ill and would be unable to submit opposition or attend oral arguments, which were scheduled for October 18, 2010.  In a final letter, also filed on October 15, 2010, Mr. Kobin stated that he had attended two weddings on the weekend of October 9-10, and had been out of the office for the entire week starting on October 11th due to illness.  He did not explain why he was unable to file opposition papers as promised on October 7, 2010 or comply with any of the Court's earlier deadlines.  Therefore, in light of Mr. Kobin's inexcusable and repeated disregard of the deadlines for filing Plaintiff's opposition

determine whether the evidence provided by Plaintiff – which is limited to the allegations in her Complaint – is sufficient to sustain her claims.  In doing so, it must apply the standard of review applicable to requests for summary judgment pursuant to Federal Rule of Civil Procedure 56.

### A. Standard of Review

Summary judgment is proper where "there is no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

The party moving for summary judgment has the burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine fact issue exists and a trial is necessary. Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

---

to the pending Motion, the Court will construe that Motion as unopposed.  In doing so, the Court notes the frivolous nature of Plaintiff's claims and the authoritative character of the documentary evidence submitted by Defendants, both of which make it unlikely that any opposition Mr. Kobin might have submitted would have had an effect on this ruling.

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The Court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate. Id. at 251-52.

**B. Plaintiff's Claims**

Plaintiff's claims must fail. As set forth above, Plaintiff's husband told the arresting officers that she had assaulted him. When they confronted her, Plaintiff appeared inebriated and was slurring her speech. Plaintiff admitted that she had been drinking alcohol and had taken various medications, but refused to specify the type of drugs she had consumed. She confessed to choking her husband. She verbally abused both the arresting officers and the EMT. She resisted efforts to transport her to a local hospital in order to ascertain whether the various substances she had consumed posed a threat to her safety. When the arresting officers attempted to take her into custody, she physically assaulted Officer Lippencott and threatened to kill them.

Under such circumstances, Plaintiff's claim that her arrest violated her civil rights is patently absurd. That claim is premised on (1) the fact that the arresting officers lacked a warrant and (2) Plaintiff's contention that, under New Jersey law, the "simple assault" she was accused of by her husband is a "disorderly person's offense" for which an arrest cannot be made unless the offense was witnessed by a police officer. See (Compl. ¶ 7.) Neither of those circumstances rendered Plaintiff's arrest illegitimate under either state or federal law.

The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,

11

shall not be violated….” U.S. Const. amend. IV. "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." Devenpeck v. Alford, 543 U.S. 146, 152 (2004). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." Id. "To determine whether an arrest is valid, we look to the law of the state where the arrest took place." Wright v. City of Philadelphia, 409 F.3d 595, 601 (3d Cir. 2005).

There is little dispute that the arresting officers in this case had probable cause to believe that a crime had been committed. Plaintiff's husband told the officers that she had assaulted him, and Plaintiff admitted to doing so. Moreover, Plaintiff's behavior during the course of her interactions with the arresting officers gave them at least two other reasons to detain her. First, she admitted to having consumed both alcohol and prescription drugs, thus leading the officers to believe that she might be in imminent danger of an overdose. Second, she committed aggravated assault on Officer Lippencott. For Plaintiff to allege that her arrest was unlawful under such circumstances simply because the officers did not have a warrant is ludicrous.

Plaintiff's contention that her arrest violated New Jersey law because "simple assault" is a "disorderly person's offense" is also unavailing. See (Compl. ¶ 7.) The facts set forth above demonstrate that there were multiple grounds justifying Plaintiff's arrest. Because she committed assault against her spouse with whom she shared a household, under New Jersey law her assault was a crime of domestic violence. N.J. Stat. Ann. § 2C:25-19. The Prevention of Domestic Violence Act of 1991, N.J. Stat. Ann. §§ 2C:25-17, et seq., specifically states that police may arrest any individual whom they have probable cause to believe committed such a

crime. N.J. Stat. Ann. § 2C:25-21(b). Additionally, New Jersey law allows police to take an individual into custody and transport him or her to a medical facility for mental health screening if, "[o]n the basis of personal observation, the law enforcement officer has reasonable cause to believe that the person is in need of involuntary commitment to treatment." N.J. Stat. Ann. § 30:4-27.6(a); see also N.J. Stat. Ann. § 30.4-27.7 (immunizing police and medical personnel who detain an individual on the basis of a good faith belief that he or she may be in need of mental health treatment from civil suits under state law). To say that Plaintiff's behavior in this case gave the arresting officer's reason to believe she was in need of involuntary commitment for mental treatment would be an understatement. As discussed above, Plaintiff admitted to assaulting her husband; appeared intoxicated and stated that she had consumed both alcohol and prescription drugs; and behaved erratically, at turns sobbing, screaming, rolling on the ground, and verbally abusing the officers. Therefore, the arresting officers acted within the bounds of both state and federal law by taking Plaintiff into custody.

Plaintiff's contention that the arresting officers used excessive force while taking her into custody is similarly frivolous. [I]t is well-established that the use of handcuffs by police during an arrest does not violate the arrestee's constitutional rights. See Atwater v. City of Lago Vista, 532 U.S. 318, 354-355 (2001) (holding that police did not violate a detainee's rights by forcing her to undergo a "normal custodial arrest," which included the use of handcuffs). Nor does the fact that Plaintiff suffered injuries during the course of her arrest justify her claims. When evaluating whether a plaintiff's rights were violated by an arresting officer's use of force, a court must determine whether the officer's actions in gaining custody of the plaintiff were "objectively reasonable." Scott v. Harris, 550 U.S. 372, 381 (2007). Factors to be considered in doing so include "the severity of the crime at issue, whether the suspect poses an immediate threat to the

13

safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 396 (1989). In this case, the record demonstrates that Plaintiff's injuries were the result of her decision to resist the officer's attempts to take her into custody. Plaintiff was repeatedly asked to go willingly, and she repeatedly refused to do so. When the arresting officers attempted to restrain her, she assaulted Officer Lippencott and tried to frustrate their efforts by rolling on the ground while kicking and screaming. Under such circumstances, the amount of force used by the arresting officers in pinning Plaintiff to the ground was reasonable, and cannot form the basis for a claim under either state or federal law.

Finally, there is no merit to Plaintiff's assertion that her constitutional rights were violated by her detention at a local hospital. There are three grounds on which Plaitniff's so-called "false imprisonment claim" could rest: (1) a contention that her arrest was unjustified, (2) an assertion that the duration of her confinement violated her rights, or (3) a claim that the arresting officers were required to take her to jail rather than the hospital. As discussed above, the first is absurd – the arresting officers had probable cause to believe that Plaintiff had committed a crime and that she was in imminent physical danger due to the consumption of alcohol and prescription drugs.

The second contention – that the duration of her confinement violated her rights – is similarly frivolous. It is well-established that, after an otherwise-valid warrantless arrest, a suspect may be confined prior to appearing before a judicial authority "for a brief period … to take the administrative steps incident to arrest." Gerstein v. Pugh, 420 U.S. 103, 113-14 (1975). Absent proof that the suspect's appearance before a judicial authority was delayed unreasonably, an appearance within 48 hours of arrest is sufficient to comply with the Fourth Amendment.

County of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991).  Here, Plaintiff was held for a period of 12.5 hours so that medical authorities could verify that she was not in danger of physical harm due to her mental condition and the combination of alcohol and prescription drugs that she consumed the night of her arrest.  Moreover, her arrest took place at roughly 10 p.m., and she was held only until the next morning.  Nothing in either federal or state law requires that police present an arrestee to a judicial authority immediately regardless of whether the arrest took place in the middle of the night.  To the contrary, police routinely hold suspects arrested outside of business hours until they can be presented to a judicial authority the next day.

      The third ground on which Plaintiff's so-called "false imprisonment" claim could rest – that she should have been taken to a jail rather than the hospital – is meritless.  There is simply no requirement that law enforcement personnel respect an arrestee's choice of detention facility.  To the contrary, when the arresting officers took Plaintiff into custody, they assumed a duty to provide her with reasonable medical care and ensure that she did not suffer physical harm from the combination of alcohol and prescription drugs she had consumed.  See DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.").

      Since Plaintiff's arrest and subsequent detention were lawful and were carried out in a reasonable manner, Defendants' contentions that Plaintiff's claims are barred by her decision to enter the PTI program and that the arresting officers are entitled to qualified immunity need not be addressed.  Similarly, there is no need to delve into the question of whether the arresting officers acted pursuant to a police or custom promulgated by the Township or STPD.  Plaintiff's

15

vicarious liability claims against those entities will be dismissed, as there was no violation of her rights under either state or federal law on which such a claim could be premised.

### III.  CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is granted and Plaintiff's claims are dismissed in their entirety with prejudice.  The Court will enter an Order implementing this Opinion.

s/ Dickinson R. Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated:  October 22, 2010